# EHLERT v. UNITED STATES

No. 120.   Argued January 13, 1971—Decided April 21, 1971

STEWART, J., delivered the opinion of the Court, in which BURGER, C. J., and BLACK, HARLAN, WHITE, and BLACKMUN, JJ., joined. DOUGLAS, J., filed a dissenting opinion, *post,* p. 108. BRENNAN, J., filed a dissenting opinion, in which MARSHALL, J., joined, *post,* p. 119.

*Paul N. Halvonik* argued the cause for petitioner. With him on the briefs were *Stanley J. Friedman, Mortimer H. Herzstein,* and *Marvin M. Karpatkin.*

*Assistant Attorney General Rehnquist* argued the cause for the United States.   On the brief were *Solicitor General Griswold, Assistant Attorney General Wilson, Beatrice Rosenberg,* and *Marshall Tamor Golding.*

*Norman Leonard* filed a brief for the Lawyers' Selective Service Panel of San Francisco as *amicus curiae* urging reversal.

MR. JUSTICE STEWART delivered the opinion of the Court.

The question in this case is whether a Selective Service local board must reopen the classification of a registrant who claims that his conscientious objection to war in any form crystallized between the mailing of his notice to report for induction and his scheduled induction date. The petitioner before us made no claim to conscientious objector status until after he received his induction notice. Before the induction date, he then wrote to his local board and asked to be allowed to present his claim. He represented that his views had matured only after the induction notice had made immediate the prospect of military service. After Selective Service proceedings not material here, the petitioner's local board notified him that it had declined to reopen his classification because the crystallization of his conscientious objection did not constitute the "change in the registrant's status resulting from circumstances over which the registrant had no control" required for post-induction notice reopening under a Selective Service regulation.[1] The petitioner then refused to submit to induction, and a grand jury in the United States District Court for the Northern District of California indicted him for violation of the Military Selective Service Act of 1967.[2]

---

[1] 32 CFR § 1625.2 (1971) provides, in pertinent part:

"[T]he classification of a registrant shall not be reopened after the local board has mailed to such registrant an Order to Report for Induction . . . or an Order to Report for Civilian Work and Statement of Employer . . . unless the local board first specifically finds there has been a change in the registrant's status resulting from circumstances over which the registrant had no control."

[2] Military Selective Service Act of 1967, § 12 (a), 50 U. S. C. App. § 462 (a) (1964 ed., Supp. V), provides in pertinent part:

"[A]ny person . . . who . . . refuses . . . service in the armed forces . . . or who in any manner shall knowingly fail or neglect or refuse to perform any duty required of him under or in the

The petitioner waived trial by jury, and the District Court, holding that ripening of conscientious objector views could not be a circumstance over which a registrant had no control, found the petitioner guilty. The conviction was affirmed by the United States Court of Appeals for the Ninth Circuit, sitting *en banc,* and we granted certiorari, 397 U. S. 1074, to resolve a conflict among the circuits over the interpretation of the governing Selective Service regulation.[3]

A regulation explicitly providing that no conscientious objector claim could be considered by a local board unless filed before the mailing of an induction notice would, we think, be perfectly valid, provided that no inductee could be ordered to combatant training or service before a prompt, fair, and proper in-service determination of his claim. The Military Selective Service Act of 1967 confers on the President authority "to prescribe the necessary rules and regulations to carry out the provisions of this title . . . ." 50 U. S. C. App. § 460 (b)(1). To read out of the authority delegated by this section the power to make reasonable timeliness rules would render it impossible to require the submission, before mailing

---

execution of this title . . . shall, upon conviction in any district court of the United States of competent jurisdiction, be punished by imprisonment for not more than five years or a fine of not more than $10,000, or by both such fine and imprisonment . . . ."

[3] In accord with the position of the Ninth Circuit, see *United States* v. *Al-Majied Muhammad,* 364 F. 2d 223, 224 (CA4); *Davis* v. *United States,* 374 F. 2d 1, 4 (CA5); *United States* v. *Taylor,* 351 F. 2d 228, 230 (CA6) (*semble*).

*Contra, United States* v. *Gearey,* 368 F. 2d 144, 150 (CA2), 379 F. 2d 915 (after remand), cert. denied, 389 U. S. 959; *Scott* v. *Commanding Officer,* 431 F. 2d 1132, 1136 (CA3); *United States* v. *Nordlof,* 440 F. 2d 840 (CA7); *Keene* v. *United States,* 266 F. 2d 378, 384 (CA10); *Swift* v. *Director of Selective Service,* —— U. S. App. D. C. ——, 448 F. 2d 1147. See also *United States* v. *Stoppelman,* 406 F. 2d 127, 131 n. 7 (CA1) (dictum), cert. denied, 395 U. S. 981.

of an induction notice, of a claim matured before that time. The System needs and has the power to make reasonable timeliness rules for the presentation of claims to exemption from service.[4]

A regulation barring post-induction notice presentation of conscientious objector claims, with the proviso mentioned, would be entirely reasonable as a timeliness rule. Selective Service boards must already handle prenotice claims, and the military has procedures for processing conscientious objector claims that mature in the service. Allocation of the burden of handling claims that first arise in the brief period between notice and induction seems well within the discretion of those concerned with choosing the most feasible means for operating the Selective Service and military systems. Further, requiring in-service presentation of post-notice claims would deprive no registrant of any legal right and would not leave a "no man's land" time period in which a claim then arising could not be presented in any forum.

The only unconditional right conferred by statute upon conscientious objectors is exemption from *combatant* training and service.[5] The Selective Service law, indeed, provides for noncombatant training and service for those objectors to whose induction there is no ob-

---

[4] The power of the Selective Service System to set reasonable time limits for presentation of claims, with the penalty of forfeiture for noncompliance, seems never to have been questioned by any court. See, *e. g., United States* v. *Gearey,* 368 F. 2d 144, 149 and n. 9 (CA2).

[5] The statute on conscientious objection begins:

"Nothing contained in this title . . . shall be construed to require any person to be subject to combatant training and service in the armed forces of the United States who, by reason of religious training and belief, is conscientiously opposed to participation in war in any form." Military Selective Service Act of 1967, § 6 (j), 81 Stat. 104, 50 U. S. C. App. § 456 (j) (1964 ed., Supp. V).

stacle.[6] The right to civilian service "in lieu of . . . induction" arises only if a registrant's "claim is sustained by the local board." It does not follow, given the power to make reasonable timeliness rules, that a registrant has an unconditional right to present his claim to the local board before induction, any more than he has such a right after induction. Congress seems rather carefully to have confined the unconditional right created by the statute to immunity from combatant training and service. Consequently, requiring those whose conscientious objection has not crystallized until after their induction notices to present their claims after induction would work no deprivation of statutory rights, so long as the claimants were not subjected to combatant training or service until their claims had been acted upon.

That those whose views are late in crystallizing can be required to wait, however, does not mean they can be deprived of a full and fair opportunity to present the merits of their conscientious objector claims for consideration under the same substantive criteria that must guide the Selective Service System. See *Welsh* v. *United States*, 398 U. S. 333. The very assertion of crystallization just before induction might cast doubt upon the

---

[6] *Ibid.:*

"Any person claiming exemption from combatant training and service because of such conscientious objections whose claim is sustained by the local board shall, if he is inducted into the armed forces under this title . . . be assigned to noncombatant service as defined by the President, or shall, if he is found to be conscientiously opposed to participation in such noncombatant service, in lieu of such induction, be ordered by his local board, subject to such regulations as the President may prescribe, to perform for a period equal to the period prescribed in [Military Selective Service Act of 1967, § 4 (b), 50 U. S. C. App. § 454 (b)] such civilian work contributing to the maintenance of the national health, safety, or interest as the local board pursuant to Presidential regulations may deem appropriate . . . ."

genuineness of some claims, but there is no reason to suppose that such claims could not be every bit as bona fide and substantial as the claims of those whose conscientious objection ripens before notice or after induction. It would be wholly arbitrary to deny the late crystallizer a full opportunity to obtain a determination on the merits of his claim to exemption from combatant training and service just because his conscientious scruples took shape during a brief period in legal limbo.[7] A system in which such persons could present their claims after induction, with the assurance of no combatant training or service before opportunity for a ruling on the merits, would be wholly consistent with the conscientious objector statute.[8]

The regulation we must interpret in this case does not unambiguously create such a system. Rather, it bars post-notice reopening "unless the local board first specifically finds there has been a change in the registrant's status resulting from circumstances over which the registrant had no control." It is clear that the regulation was meant to cover at least such nonvolitional changes as injury to the registrant or death in his family making him the sole surviving son. The Government urges that

---

[7] Since such a "no man's land" would be intolerable, our decision today simply involves settling in which forum late crystallizers must have an opportunity for a ruling on the merits. Whether they must have such an opportunity at all cannot be open to question. Of course, a claimant who, after induction, declined to utilize available administrative procedures or who failed to observe reasonable and properly publicized time cutoffs might forfeit his claim.

[8] There is no reason to suppose that a Selective Service local board, faced with the need to fill its monthly quotas, would be more sensitive in applying the legal standards that govern all conscientious objector claims than would the Army, whose mission is to train inductees as members of military units of maximum effectiveness and morale.

the regulation be confined to just such "objectively identifiable" and "extraneous" events and circumstances. The petitioner contends that post-notice crystallization of conscientious objection is both a "circumstance" within the meaning of the regulation and one over which the registrant has no control.

We need not take sides in the somewhat theological debates about the nature of "control" over one's own conscience that the phrasing of this regulation has forced upon so many federal courts. Rather, since the meaning of the language is not free from doubt, we are obligated to regard as controlling a reasonable, consistently applied administrative interpretation if the Government's be such. *Immigration Service* v. *Stanisic,* 395 U. S. 62, 72; *Thorpe* v. *Housing Authority,* 393 U. S. 268, 276; *Udall* v. *Tallman,* 380 U. S. 1, 16–17; *Bowles* v. *Seminole Rock & Sand Co.,* 325 U. S. 410, 413–414.

The Government argues for an interpretation identical in effect with the unambiguous rule hypothecated above, which, we have said, would clearly be a reasonable timeliness rule, consistent with the conscientious objector statute. The Government's interpretation is a plausible construction of the language of the actual regulation, though admittedly not the only possible one. Given the ambiguity of the language, it is wholly rational to confine it to those "objectively identifiable" and "extraneous" circumstances that are most likely to prove manageable without putting undue burdens on the administration of the Selective Service System. It appears, moreover, that this position has been consistently urged by the Government in litigation when it was not foreclosed by adverse local precedent.

There remains for consideration whether the conditions for the validity of such a rule, discussed above, are met in practice. It appears undisputed that when an inductee

presents a prima facie claim of conscientious objection that complies with timeliness rules for in-service cognizability, he is given duty involving the minimum practicable conflict with his asserted beliefs.[9] It is thus evident that armed forces policy substantially meets the requirement of no combat training or service before an opportunity for a ruling on the claim.

As for the absence of any no man's land, the pertinent military regulations are somewhat inconsistent in their phrasing, perhaps because of the sharp division among the courts of appeals. They contain language appearing to recognize the obligation of the service to hear the claims of those whose alleged conscientious objection has crystallized between notice and induction, but they also contain formulations seeming to look the other way.[10]

---

[9] Department of Defense Directive No. 1300.6, § VI B (May 10, 1968):

"With respect to persons who have already served a portion of their obligated service who request discharge or non-combatant service for conscientious objection, the following actions will be taken:

.          .          .          .          .

"2. Pending decision on the case and to the extent practicable the person will be employed in duties which involve the minimum conflict with his asserted beliefs. . . ."

Army Regulation No. 635–20, ¶ 6a (July 31, 1970):

"[I]ndividuals who have submitted formal applications . . . for discharge based on conscientious objection will be retained in their units and assigned duties providing the minimum practicable conflict with their asserted beliefs pending a final decision on their applications. In the case of trainees, this means that they will not be required to train in the study, use, or handling of arms or weapons. . . ."

[10] See Army Regulation No. 635–20, ¶ 3:

"a. Consideration will be given to requests for separation based on bona fide conscientious objection to participation in war, in any form, when such objection develops subsequent to entry into the military service.

"b. Federal courts have held that a claim to exemption from

We are assured, however, by a letter included in the briefs in this case from the General Counsel of the Department of the Army to the Department of Justice, that present practice allows presentation of such claims, and that there thus exists no possibility that late crystallizers will find themselves without a forum in which to press their claims.[11] Our conclusion in this case is based upon that assurance.[12] For if, contrary to that assurance, a situation should arise in which neither the local board nor the military had made available a full opportunity to present a prima facie conscientious objection claim for determination under established criteria, see *Welsh* v. *United States, supra,* a wholly different case would be presented.

Given the prevailing interpretation of the Army regulation, we hold that the Court of Appeals did not misconstrue the Selective Service regulation in holding that

military service under Selective Service laws must be interposed prior to notice of induction, and failure to make timely claim for exemption constitutes waiver of the right to claim. . . . Requests for discharge after entering military service will not be favorably considered when—

"(1) Based on conscientious objection which existed, but which was not claimed prior to notice of induction, enlistment or appointment."

See also Department of Defense Directive No. 1300.6, § IV B 2.

[11] "You also asked whether the Army allows a soldier to file for discharge in instances where his conscientious objector views are fixed after notice of induction but prior to entry into the military service. Present practice grants the soldier the opportunity to file in such cases."

The letter additionally explains the composition and operation of the Army I–O Conscientious Objector Review Board, which has the responsibility of ruling on applications for conscientious objector discharges. The Board is composed of a senior officer, an officer in the Judge Advocate General Corps, a chaplain, and a Medical Corps officer. Only two votes are required to approve an application.

[12] The same letter from the General Counsel of the Department of the Army reports that the identical interpretation prevailed in 1965, when the petitioner first was ordered to report for induction.

it barred presentation to the local board of a claim that allegedly arose between mailing of a notice of induction and the scheduled induction date. Accordingly the judgment of the Court of Appeals for the Ninth Circuit is

*Affirmed.*

MR. JUSTICE DOUGLAS, dissenting.

The rather stuffy judicial notion that an inductee's realization that he has a "conscientious" objection to war is not a circumstance over which he has "no control" within the meaning of the Regulation [1] is belied by experience. Saul of Tarsus would be a good witness: [2]

> "Now as he journeyed he approached Damascus, and suddenly a light from heaven flashed about him. And he fell to the ground and heard a voice saying to him, 'Saul, Saul, why do you persecute me?' And he said, 'Who are you, Lord?' And he said, 'I am Jesus, whom you are persecuting; but rise and enter the city, and you will be told what you are to do.'"

The stories of sudden conversion are legion in religious history; and there is no reason why the Selective Service boards should not recognize them, deal with them, and, if sincere, act on them even though they come after notice of induction has been received.

The Court holds that the proper remedy is in-service processing of these claims. That is to say, the claims that come so late, even though they come prior to induction, are to be processed by military rather than by civilian personnel.

This conclusion is not required by the Regulation for, as I have said, sudden conversion is a commonplace in religious experiences. And we deal here with religious,

---

[1] 32 CFR § 1625.2 (1971).

[2] 9 Acts 3–6 (rev. Standard ed. 1952).

ethical, philosophical attitudes that are commonly summarized in capsule form by reference to "conscience."

It is therefore a *tour de force* for the Court to say that in-service processing by the military is required. Certainly that result is not mandated by the Act.[3] Since it is not, we have a choice in construction which really involves a choice of policy. Faced with that choice we should not hesitate to leave these matters to civilian authorities.

Chief Justice Stone, before coming to this Bench, served with two other lawyers named by President Wilson to screen conscientious objectors in World War I. One of the three was in the military, the other two were civilians. In the account he wrote, he said:[4]

"[I]t was the relatively small residue of non-religious objectors who brought to the Board its real perplexities. While conscience is commonly associated with religious convictions, all experience teaches us that the supreme moral imperative which sometimes actuates men to choose one course of action in preference to another and to adhere to it at all costs may be dissociated from what is commonly recognized as religious experience. The President's order expressly recognized that scruples against participating in war might be conscientious although not religious. How to detect the presence

---

[3] See § 6 (j) of the Military Selective Service Act of 1967, 81 Stat. 104, 50 U. S. C. App. § 456 (j) (1964 ed., Supp. V): "Nothing contained in this title . . . shall be construed to require any person to be subject to combatant training and service in the armed forces of the United States who, by reason of religious training and belief, is conscientiously opposed to participation in war in any form. As used in this subsection, the term 'religious training and belief' does not include essentially political, sociological, or philosophical views, or a merely personal moral code."

[4] Stone, The Conscientious Objector, 21 Col. U. Q. 253, 263 (1919).

of such scruples and to distinguish them from the mere extremist support of more or less novel social or political theories and from mere individualistic resistance to the will of the majority, such as one sometimes sees in the petulant disobedience of an ill-disciplined child, was the difficult task."

The mind of the military has reacted more violently to the conscientious objector than the mind of the priest or other civilian.

The story of in-service processing of these claims in World War I is an unpleasant one:

"The phrase 'well-recognized religious sect' was given the most rigorous interpretation, and any who based conscientious objections on political rather than religious foundations got short shrift. Such objectors were either 'shot to death by musketry,' 'imprisoned for long terms by court martial,' or subjected to indignities and physical violence 'by their more patriotic fellows.' " [5]

Another account [6] is substantially the same:

"In military camp and prison alike, objectors were often subjected to indignities and to physical cruelty. Some were beaten; others were hung by their fingers to the doors of their cells in such a way that their feet barely touched the floor. In one case, an objector who refused to don the army uniform was kept in a damp cell, where he contracted pneumonia and died. His dead body was then dressed in the uniform that in life he had spurned, and, thus attired, was sent home to his family. A number of objectors among the absolutists went on hunger strikes and had to be fed forcibly."

[5] A. Mason, Harlan Fiske Stone: Pillar of the Law 102 (1956).
[6] M. Sibley & P. Jacob, Conscription of Conscience 15 (1952).

According to the accounts, the treatment of conscientious objectors in World War II was not as severe as in World War I. But the main disciplinary device was to give the man an order and then court-martial him for failure to obey the order. "Here punishment *varied,* but common sentences for objectors were five to ten years, although these were not infrequently reduced on review by Washington. Sentences on the whole were much lighter than those imposed by *courts-martial* during the First World War but more severe, on the average, than those meted out by *civil courts* during the Second World War. Sentences of general courts-martial were served in the several disciplinary barracks of the Army, but in some instances objectors were first sent to a 'rehabilitation center,' where the Army gave prisoners a second chance to 'reform'; if 'reformation' did not take place, they served out their sentences in the disciplinary barracks. Army regulations provided for periodic and automatic clemency reviews, the first during the initial six months of the sentence and subsequent reviews once each year."[7] (Emphasis added.)

I have placed in the Appendix to this dissent a summary of a recent (1969) record in one military center, showing how one conscientious objector in *Jones* v. *Lemond,* 396 U. S. 1227, was treated.

I do not suggest that every detention center in the Armed Services is like the brig on Treasure Island, San Francisco Bay. Nor do I suggest that every conscientious objector is treated as cruelly as was the plaintiff in the *Lemond* case. I do suggest however that in my time every conscientious objector was "fair game" to most top sergeants who considered that he had a "yellow streak" and therefore was a coward or was un-American. The conscientious objector never had an easy time asserting First Amendment rights in the Armed Services.

---

[7] *Id.,* at 108.

112

What might happen to him in the barracks or in the detention center is, of course, not the measure of what would transpire at the hearings. But the military mind is educated in other values; it does not reflect the humanistic, philosophical values most germane to ferreting out First Amendment claims that are genuine.

Our decisions on conscientious objection leave considerable latitude for administrative findings. On one hand *Gillette* v. *United States* and *Negre* v. *Larsen,* 401 U. S. 437, make it clear that objection to a particular war will not qualify for conscientious objector status. On the other hand, both *United States* v. *Seeger,* 380 U. S. 163, and *Welsh* v. *United States,* 398 U. S. 333, demonstrate that the objector need not be religious and his views may be based on broad humanistic grounds. There are subtleties in these positions for, as noted, "§ 6 (j)'s exclusion of those persons with 'essentially political, sociological, or philosophical views or a merely personal moral code' should [not] be read to exclude those who hold strong beliefs about our domestic and foreign affairs or *even those whose conscientious objection to participation in all wars is founded to a substantial extent upon considerations of public policy."* 398 U. S., at 342 (opinion of BLACK, J.) (emphasis added).

Thus under the Court's interpretations of § 6 (j) those who do not qualify are those who lack sincerity, do not oppose all wars, or those who rest their beliefs "solely upon considerations of policy, pragmatism, or expediency." *Id.,* at 342–343. Decision as to whether an individual is entitled to a conscientious objector status under these broad criteria requires great sensitivity on the part of those who have the final say.

Ehlert's claim itself falls somewhere between *Gillette* and *Welsh.* In addition it raises claims between pragmatism and a respect for human life and values. His beliefs are not religious in nature. He stated they came

from "the intellectual atmosphere of the University of California and its surroundings and the natural workings of an eager-to-know and questioning mind." In a letter refusing induction he stated his objection was "that the sole purpose of military service in this country today is preparation for a nuclear orgasm which would be totally destructive of human life and values." On his Form 150 he wrote "that service in the armed forces of this country at this time is work toward the end of the destruction of the human race. I consider that my duty not to work for the destruction of the human race is superior to any duties which may arise from any human relation." He added he would use force where its use "would not make more probable the destruction of the human race."

While it appears that Ehlert's claim may be sufficiently close to *Gillette* to foreclose his claim, other claims in this sensitive area may not be as close to *Gillette,* yet also may be beyond *Welsh.* In a choice between civilian and military factfinders dealing in an area of conscience clearly the former are to be preferred.

Moreover, proof of a conscientious objector's claim will usually be much more difficult after induction than before. Military exigencies may take him far from his neighborhood, the only place where he can find the friends and associates who know him. His chances of having a fair hearing are therefore lessened when the hearing on his claim is relegated to in-service procedures. For these reasons I would resolve any ambiguities in the law in favor of pre-induction review of his claim and not relegate him to the regime where military philosophy, rather than the First Amendment, is supreme.

Beyond all these arguments is a constitutional one. Induction itself may violate the privileges of conscience engrained in the First Amendment. A compelled act was the heart of the case presented by *Board of Education* v. *Barnette,* 319 U. S. 624, when children of Je-

114

hovah's Witnesses protested the requirement that they salute the flag. We said:

> "Struggles to coerce uniformity of sentiment in support of some end thought essential to their time and country have been waged by many good as well as by evil men. Nationalism is a relatively recent phenomenon but at other times and places the ends have been racial or territorial security, support of a dynasty or regime, and particular plans for saving souls. As first and moderate methods to attain unity have failed, those bent on its accomplishment must resort to an ever-increasing severity. As governmental pressure toward unity becomes greater, so strife becomes more bitter as to whose unity it shall be. Probably no deeper division of our people could proceed from any provocation than from finding it necessary to choose what doctrine and whose program public educational officials shall compel youth to unite in embracing. Ultimate futility of such attempts to compel coherence is the lesson of every such effort . . . . Those who begin coercive elimination of dissent soon find themselves exterminating dissenters. Compulsory unification of opinion achieves only the unanimity of the graveyard.
>
> "It seems trite but necessary to say that the First Amendment to our Constitution was designed to avoid these ends by avoiding these beginnings." *Id.*, at 640–641.

To some conscientious objectors, taking the one step forward is an act violating the conscience, since wearing the uniform in any form is as revolting to them as saluting the flag was to the children in the *Barnette* case.[8] To another conscientious objector the bearing of arms, not acting as orderlies, say, in military hospitals, is the

---

[8] See *United States* v. *Freeman*, 388 F. 2d 246, 248–249.

act at which he rebels. The sorting and sifting of these claims and all varieties of them are best processed by civilians rather than the military. The present Regulations permit it and I would resolve any ambiguities in favor of the procedure most protective of the rights of conscience involved here.

I therefore dissent from affirmance of the judgment below.

### APPENDIX TO OPINION OF DOUGLAS, J., DISSENTING

On September 15, 1969, I entered a stay in the case of *Jones* v. *Lemond,* 396 U. S. 1227. Jones was in the United States Navy and his claim to discharge as a conscientious objector arose five months after his enlistment. According to the allegation he had made many attempts over a period of some 37 days to file an application to be discharged as a conscientious objector. He was unable to make a filing or obtain a hearing. He went AWOL on that account and later surrendered himself and with the help of legal advice pressed for processing of his conscientious objector claim.

I did not reach the merits of that controversy, but in view of the representations made I restrained the Navy from confining Jones in the brig at Treasure Island, which according to the affidavits presented to me had become a house of horror.

"After sitting in the room approximately 45 minutes, I heard Mr. Foreman say, 'He is an escape risk and is to be sentenced for 5 months—he is not to be allowed to phone anyone.' Immediately after I heard Mr. Foreman speak, a Marine Sergeant opened the door and said to me 'empty your pockets, f---er.' I began to empty my pockets to which the Sergeant said, 'hurry up, Goddamnit.' When I had finished emptying my pockets

the Sergeant said, 'up against the wall—spread your arms and legs.' I spread my arms out against the wall and placed my feet approximately 3½ feet apart. The Sergeant kicked my legs several times and said, 'Move them further.' I then stretched them as far as possible, so the Sergeant kicked me a couple of more times to make sure they were spread as far as possible. He then frisked me, which involved slapping and shoving me against the wall. When he finished his so-called frisk, he handcuffed my hands behind me and said, 'Alright, let's go—one f--k-up and I'll bust your f--kin head open.'

"I was then taken to the Brig and told to stand in front of the fence with my nose on the canvas. I stood at attention with my nose on the canvas and the Sergeant went into the main control room.

"About 5 minutes later the Sergeant came out with another Sergeant. The Sergeant said 'empty your pockets.' I took out a pen and chow pass and offered them to the second Sergeant. He said, 'don't point at me f--ker, put that s--t in your hat.' I emptied my pockets and put everything into my hat. The Sergeant said, 'put it on the ground.' The Sergeant said to the other Sergeant, 'he's still pretty salty—I got him when I picked him up, but he still thinks he's tough.' The reply was, 'don't worry, he won't be so tough, I know what to do with him.' He said, 'spread your arms and legs turd.' I spread out against the canvas. He started kicking me and yelling, 'spread out a--hole.' He kept kicking me and yelling until I fell down and then said, 'what's wrong with you pussy can't you stand up—get up.' I stood up and he said 'spread out Goddamnit.' He started kicking me again. When I fell to my knees against the canvas he stopped and said, 'can't you stand up squid?' This time I got up and spread out hands on the canvas before he could say so. He then pushed my face into the canvas, slapped my neck and arms,

punched me in the sides, yanked the crotch of my dungarees painfully between my legs, slapped and pinched my legs and said, 'alright now stand at attention.' He had now finished frisking me so they both went back into the control room taking with them the contents of my pockets in my hat.

"After much verbal harassment, I was taken to my cell.

"A couple of hours later I heard the orange badges march in. They live in the Annex in 6' x 6' x 8' cells, 3 men per cell. I heard a Corporal yelling at an orange badge for not running fast enough during the physical exercise period. He then made the orange badge do push-ups until he collapsed. Then I could hear the Corporal hitting the man and the man crying and screaming for him to stop. When the Corporal stopped they took the man back out into the compound to run and that was the last I heard of him.

"Dinner was brought to my cell and I ate it on the floor as I did with all the rest of my meals.

"Early in the evening a Corporal started harassing a confinee who was locked in the suicide risk cell. Suicide risks have to sit in the cells, which I found to be very cold with my clothes on, in nothing but a pair of underwear. The Corporal kept antagonizing the man until he started screaming and crying. Once the Corporal succeeded in breaking the confinee he started laughing, at which time the other Corporal said, 'why don't you kick his ass for making so much noise?'

"The next day I was taken for a haircut. Another confinee cut my hair and while doing so he dropped a clip but couldn't find it. I told him where it was and he said, 'don't let them catch you talking to me, they'll kick your ass.' I kept quiet.

"After much more harrassment, I went back to my cell and I heard a man coughing and then a Corporal yelling at him to shut up. Two other Corporals joined in harrassing the man and when he couldn't stop cough-

ing they pulled him out of the cell and made him dive on a cup on the floor pretending it was a grenade. They got several other men out of their cells and had them all diving on the cup with the coughing man on the bottom each time.

"It wasn't long after the grenade drills when the turnkey came to my cell and let me out. He had me fold up my blanket and pick up my locker and pulled me out to the control office. In the office there were 4 or 5 Sergeants and a Staff Sergeant yelling and screaming all types of phrases, such as, 'you'll be back, f– –ker and then you'll really get it.' I now was told to stand holding my footlocker with my arms extended and they seemed to forget me for a moment.

"Then they began talking among themselves and I realized that my lawyer, Don Jelinek and Loren Basham, a member of the Resistance, were outside the Brig in a car and they apparently insisted on remaining there until I was released. The Sergeant said 'This guy (Jelinek) just pissed me off because he just charged in here and slapped this order down and said "get this man out." ' Then the Sergeant said, 'I have a psychiatrist over here (pointing to the medical building right behind us), who will back me up saying I am not responsible for anything I do.' He then added, 'In a minute I am going to go out and blow their heads off.'

"Then the Sergeant seemed to gain control of himself. The MP then turned to me and said, 'Just try and run boy, I would love to blow your head right off.'

"I was then allowed outside the Brig where I saw my Lawyer who spoke to me, but I was afraid to answer him for the fear they would beat or shoot us.

"I know they worked me over because of anger because the Military Court of Appeals gave me an order keeping me out of the Brig. Now that a second Court Order has gotten me out of the Brig, I feel they will kill me if I have to go back in again."

MR. JUSTICE BRENNAN, with whom MR. JUSTICE MAR-SHALL joins, dissenting.

Selective Service Regulation 1625.2, 32 CFR § 1625.2 (1971), relieves a local board of its general obligation to consider a registrant's claim for deferment whenever the claim is received after the notice to report for induction has been mailed "unless the local board first specifically finds there has been a change in the registrant's status resulting from circumstances over which the registrant had no control." The Court of Appeals held that this regulation relieved the local board of the necessity of considering any claim that a registrant's conscientious objection to war had crystallized after receipt of an induction notice because, in the court's view, registrants have control over such changes in their beliefs. 422 F. 2d 332 (CA9 1970). The Court here finds it unnecessary to come to grips with this holding and consider whether a conscientious objection claim comes within the terms of this regulation, since it finds the interpretation of the regulation controlled by "a reasonable, consistently applied administrative interpretation." *Ante,* at 105.

I cannot defer to an interpretation I cannot discover. All of the cases cited by the Court make clear that judicial interpretation of an ambiguous regulation is to be informed by reference to *administrative practice* in interpreting and applying a regulation, not by reference to positions taken for the purpose of litigation. See cases cited, *ante,* at 105. Cf. *Citizens to Preserve Overton Park* v. *Volpe,* 401 U. S. 402, 419 (1971). The national Selective Service office has apparently made no national administrative interpretation of the regulation. The only other information presently before us indicates that state Selective Service headquarters in North Carolina and California have interpreted the regulation to require local boards to consider "late crystallization" claims and

to consider whether the registrant's conscientious objection was a change occurring after receipt of his induction notice over which he had no control. Brief for Petitioner 28 n. 53. If anything, this suggests that petitioner's interpretation should prevail. On this state of the record, however, I hardly think administrative practice can properly form the basis of decision.

Moreover, I do not find the regulation to be ambiguous. In the context of a blanket Selective Service regulation applicable to all claims for deferment and exemption, the reference to "circumstances" must be taken to refer to any conditions relevant to eligibility for a deferment or exemption. Since conscientious objection to war is the basis for a deferment, it must constitute a "circumstance" within the plain meaning of the regulation. The question, therefore, is whether that circumstance can be one "over which the registrant had no control." On that score, I fully agree with the dissent of Judge Merrill below:

> "One simply cannot order his conscience to be still or make himself believe what he does not believe and I must reject the implication that it is right and proper that one should suffer loss of status for having failed to bring his conscience to heel.

> "Conscientious objection, in truth, is a contradiction of control. Just as a conviction honestly dictated by conscience cannot be banished at the will of the holder, so, conversely, a belief conveniently subject to the control of the holder is not conscientiously entertained." 422 F. 2d, at 339.

In sum, I think the regulation means that late-crystallization claims asserted prior to induction should be processed by civilian personnel of the local boards, who have been designated by the Congress as the appropriate decisionmakers in these cases, rather than by military personnel during in-service processing. I dissent.