476 F.2d 1038
 Bruce H. RICHMOND, United States Army, by Daniel Kallen his
next friend and attorney, Plaintiff-Appellant,
v.
General Stanley LARSON, Commanding Officer, United States
Army, Presidio, San Francisco, California, et al.,
Defendants-Appellees.
 No. 71-2741.
 United States Court of Appeals,
Ninth Circuit.
 March 5, 1973.
 
 Michael E. Somers, Daniel Kallen, Santa Monica, Cal., for plaintiff-appellant.
 James L. Browning, Jr., U. S. Atty. Robert E. Carey, Jr., F. Steele Langford, Asst. U. S. Attys., San Francisco, Cal., for defendants-appellees.
 Before ELY, HUFSTEDLER, and GOODWIN, Circuit Judges.
 HUFSTEDLER, Circuit Judge:
 
 
 1
 Richmond appeals from an order denying his habeas petition seeking release from the Army after it had rejected his application for discharge based on his claim of conscientious objection.
 
 
 2
 Richmond was a small-town Ohio boy from a family of modest means. His mother, a devout churchgoer, saw to it that he was a steady attendant at Sunday school and church services. He achieved honor status in the Boy Scouts. In his early teens, he became disaffected with organized religion because, in his view, the adherents were hypocritical. When he became 17 in 1967, he dropped out of high school and enlisted in the Army where he received training as a field wire maintenance man. In 1968, his father fell ill and his family's financial condition was precarious. He reenlisted in the Army at that time because he could thereby give greater support to his family. He was thereafter trained as a crewman for the Nike missile program. In late 1969 and early 1970, he began to think seriously about his beliefs. He read books, talked to people about war, and participated in some peaceful antiwar demonstrations. Sometime in June 1970, he received orders to report to Korea; he knew that there was a possibility of going to Viet Nam. Richmond testified that his conscientious objector beliefs began to crystallize when he knew that he would have to face war and killing. He received orders of reassignment to Viet Nam in July 1970. He refused his orders and was imprisoned for 51 days. A general court martial was authorized. During the investigation made as a part of the court martial preliminaries, he testified that he was not afraid for his own life, but he could not kill. He was told that a general court martial could result in his imprisonment for up to six years and that the court martial would be dropped if he agreed to go to Viet Nam. He refused the offer. (The general court martial was later dropped anyway.) His efforts to file conscientious objector application were briefly delayed while the court martial proceedings were commenced, but before the end of July 1970 he filed his application. He was interviewed by a chaplain, Captain Towne, on October 23, 1970. Captain Towne recommended that the application be granted, stating that he believed Richmond "is conscientiously opposed to participating in the Army in any way. He has convinced me that the basis for the application is religious . . . . He believes it is wrong to kill and, also, that it is just as wrong to be a contributor to the act of killing, irregardless of how small or far removed."
 
 
 3
 On November 9, 1970, a hearing was held before Captain C. D. Waite, a full transcript of which is in the record. Captain Waite recommended disapproval of Richmond's application. He gave these reasons: "Based upon my twohour plus interview with him, it is my opinion that Pfc. Richmond should not be granted conscientious objector status. I do feel that he is essentially a moral person. However, it seems to me that his primary motive is to evade military service in the interest of his own personal safety and even more importantly, to stand up for his current political convictions. He repeatedly indicated that he wanted 'to stand up and be counted' as one who didn't support war. Furthermore, his objections seemed geared almost entirely to a particular war (Viet Nam)."
 
 
 4
 The decision was reviewed by an Army board. The board rejected the application, stating:
 
 
 5
 The Board finds that the applicant's request is based solely upon considerations of policy, pragmatism, or expediency and uses the following evidence from the record to support its findings. The timing of PFC Richmond's application casts serious doubt on the sincerity of his professed beliefs. He applied only after receipt of orders of reassignment to the Republic of Vietnam. "Sudden excessions of belief may be utterly sincere, as the memorable one on the Damascus Road; but they seldom synchronize so perfectly as (Richmond's) with external facts making them convenient . . ." United States v. Corliss [D.C.S.D. N.Y.1959) 173 F.Supp. 677]. The Board also noted from the report of the psychiatrist that the applicant is presently applying for a hardship discharge in addition to this application for discharge as a conscientious objector.
 
 
 6
 Additionally, the Board noted that PFC Richmond's application lacks the depth of conviction required to qualify for discharge as a conscientious objector. There is no reason stated in the application for this change in the basic beliefs of the applicant which now make him feel that he can no longer continue in the military service. The Board is left to conclude that the orders for Vietnam play an important part in this decision to file for conscientious objection. In the letter of support from PFC Richey A. Clark it is stated "Bruce's beliefs have matured since I've known him and even more so since he found out he was on orders for Vietnam." CPT C. D. Waite, an officer knowledgeable in the policies and procedures relating to conscientious objection matters and before whom PFC Richmond personally appeared stated in his report of that interview "However, it seems to me that his primary motive is to evade military service in the interest of his own personal safety and even more important to stand up for his current political convictions. He repeatedly indicated that he wanted to stand up and be counted as one who didn't support war. Furthermore, his objections seem here almost entirely to a particular war (Vietnam)." In answer to one of CPT Waite's questions "If you had the opportunity, would you leave the United States than go to Fort Levinworth to prison for not going to Vietnam for refusing orders?" The applicant answered "I've thought about this quite often and I don't know it's kind of another balance I have made yet, whether it would be worth it to go to Canada and be against it there or go to jail and show people who believe that the war is wrong, show them that somebody has stood up-just showing people that there's other people against the war. It's an example to follow if you want to say as such." This leaves the Board to find that the applicant's request is based on objection to a particular war rather than opposition to war in any form.
 
 
 7
 Richmond exhausted his Army remedies by applying for further review to the Secretary of the Army. The Secretary disapproved the application, stating "Applicant lacks the depth of conviction required to qualify for discharge as a conscientious objector, also, applicant's request is based solely upon considerations of policy, pragmatism, or expediency."
 
 
 8
 The sole objective facts in the record that can be cited to support these multiple conclusions are that Richmond did not file his application for conscientious objector status until he received orders to report to Viet Nam and that he had also filed for a hardship discharge after his father was disabled.
 
 
 9
 All of the letters filed with Richmond's application attest to his sincerity and to the depth of his convictions. His mother expressed her opposition to his decision to seek discharge from the Army, but she affirmed that his conscientious beliefs were sincere. She observed that "punishment will not change his views, even if it were possible to force him into subjection." The transcript of the hearing before Captain Waite is replete with testimony to the same effect.
 
 
 10
 The record is barren of any evidence to sustain Captain Waite's conclusion that Richmond was motivated by his political views.[1] It is full of evidence that Richmond's aversion to war was not selective.[2] The board quoted the only passage in the entire transcript which remotely suggests selectivity. Read in context, the statement does not support an inference that his objection to war was limited to Viet Nam.
 
 
 11
 The record also fails to sustain the board's statement that Richmond gave no reasons for a change in his beliefs which now make him feel that he could not continue in military service. He stated the growth and development of his ideas, the increasing struggle with his conflicts, and the crystallization of his beliefs that occurred when he received orders to Viet Nam.
 
 
 12
 The key to the board's decision is its statement: "The Board is left to conclude that orders for Vietnam play an important part in this decision to file for conscientious objection." The record fully supports that statement because, according to Richmond's consistent testimony, it was his orders that compelled him to resolve his conflict and to make his choice between duty to the Army and duty to his conscience.
 
 
 13
 Each level of Army consideration was pinned to the timing of his application. Each officer inferred that a claim of crystallization based on receipt of orders could not be sincere. Yet, human experience repeatedly contradicts the inference: We again and again fail to decide what we think about a situation until we must confront it. Recognizing this reality, we have held that crystallization of conscientious objector views upon receipt of orders to Viet Nam is not an indicium of insincerity. (Tressan v. Laird (9th Cir. 1972) 454 F.2d 761; cf. Rastin v. Laird (9th Cir. 1971) 445 F.2d 645.) We also recognize how extremely difficult it is for career military personnel to accept as sincere convictions of persons such as Richmond when those views are directly opposed to their own. (Some of the literature on the subject is collected in Ehlert v. United States (1971) 402 U.S. 99, 108, 91 S.Ct. 1319, 28 L.Ed.2d 625 (Douglas, J., dissenting).)
 
 
 14
 For these and reasons further expressed in Tressan, we reverse the order and remand the cause with instructions that the Army be allowed a reasonable time within which to grant discharge to Richmond pursuant to Army regulations applicable to conscientious objectors, failing which the writ shall be granted by the district court.
 
 
 15
 ALFRED T. GOODWIN, Circuit Judge (dissenting).
 
 
 16
 I dissent from the reversal in this case for the reason that I believe that the scope of judicial review of military personnel decisions is narrower than that implied in the majority opinion.
 
 
 17
 The personal tragedy of a mixed-up young man naturally places a reviewing court in a difficult position. But as I understand our duty on habeas corpus, we can intervene in the administration of military separation policy only when there is no evidence to support the administrative decision. I cannot say in this very close case that there is no evidence to support the Army's decision.
 
 
 
 [1]
 Tangential references to politics were made by the interrogator, not by Richmond. Typical exchanges are these:
 "Q. What do you think about the present administration's handling of the war in the last few months
 "A. That's a strange thing-I don't know really what to think of it. It's confused and the reports on it, I can't believe them all so I can't really say because we get conflicting reports such as the Laos reports, so I can't be sure exactly what they're doing. I can't know exactly what their policies are because they don't always say.
 ". . . .
 "Q. Do you know the difference between politicians and professional diplomats?
 "A. Not really.
 "Q. Do you happen to know Senator Muskie's political beliefs as far as the war in Viet Nam?
 "A. No, I don't.
 "Q. Do you know of any Senators or Congressmen who are opposed to the war in Viet Nam and have beliefs similar to you or many of these people that aren't in government that have been discussed here today?
 "A. From what I understand McGovern and Hatfield are against it and the Massachusetts governor was trying to pass laws on it."
 
 
 [2]
 For example: "Q. Is that the only reason that you refused those orders [to Viet Nam]?
 "A. Because I could not kill and I could not go along with the war, any war."
 Asked about whether he would have joined the war effort in World War II, he replied:
 "If I was placed in the situation where I was in World War II and I believed the same as I do now, how would I react? Is that what you're asking? If I reacted at all towards the war, I would stay at home and I would work for the people at home-the ones that were suffering during the time of the war at home. I could not join the war."
 "Q. Just give me a rundown of what you feel now about war, killing people-tell me what your beliefs are that you based your application as conscientious objector on and how you felt you arrived at those beliefs. You can do this however you want.
 "A. As far as my beliefs go, I believe that killing is wrong and especially war. It seems unnecessary to waste these lives and I think that we have reached a stage where war can be avoided. It could have been avoided before but especially now. Through things that have happened towards mass media, towards getting things out to the people, I think that war can be avoided. I think that killing is just a waste of human life which could be put to some constructive use. Every individual life is worth so much more than just a piece of dirt to be sent out and killed. I think that human lives are not just numbers, they're people and that they are important. It's just unnecessary to kill especially en masse. I've reached these beliefs through books that I've read, people that I've known, things that I've done, seen, in everyday life these things have come through. Even in some simple books that don't seem like they have anything in them, you can find where there's beauty and there's a necessity for people to live. It is possible for people to live and pass productive lives that are useful."