**W. L. DOBBS, Mayor, and City of Covington, Georgia**

v.

**Honorable Russell E. TRAIN, Administrator, and Honorable Jack E. Ravan, Regional Administrator, Region IV, United States Environmental Protections Agency.**

Civ. A. No. C 74–2076 A.

United States District Court,
N. D. Georgia,
Atlanta Division.

Oct. 23, 1975.

W. Kent Campbell, Campbell & Bou-chillon, Covington, Ga., Lloyd Sutter, O'Callaghan, Saunders, Sutter & Stumm, Atlanta, Ga., for plaintiffs.

William D. Mallard, Jr., Asst. U. S. Atty., Thomas H. Ries, Asst. Regional Counsel, Environmental Protection Agency, Atlanta, Ga., William L. Want, Atty., Dept. of Justice, Washington, D. C., for defendants.

## ORDER

JAMES C. HILL, District Judge.

Plaintiffs, W. L. Dobbs, Mayor, and the City of Covington, Georgia, bring this sewage treatment works reimbursement action arising under the Federal Water Pollution Control Act Amendments of 1972 (the "Act"), 33 U.S.C. § 1251 *et seq.* This action was filed as a result of the refusal of defendants, Russell E. Train, Administrator, and Jack E. Ravan, Regional Administrator, Region IV, United States Environmental Protection Agency (hereinafter "EPA") to reimburse plaintiffs certain sums expended to construct the Dried Indian Creek sewage treatment plant and outfall line. The dispute centers around the meaning of "initiation of construction."

The complaint in this case challenges the EPA's decision that the City of Covington was ineligible for reimbursement for certain sewage treatment costs claimed under Section 206 of the Act, 33 U.S.C. § 1286. The chronological order of events in regard to construction of the sewage treatment plant is not in dispute. Beginning in January, 1971, the City proposed a rate revision to provide funds for a bond issue for the sewer construction. The funds from the sale of the bonds were received on November 29, 1971. On March 12, 1971, an engineering contract was signed between the City and Welker & Associates to provide the design and specifications for the sewer construction. On March 16, 1971, a grant offer was made to the City by the EPA and accepted on April 5, 1971. On September 13, 1971, the soil testing and exploratory boring were completed by the Georgia Testing Laboratory. On December 16, 1971, the plans and specifications for the construction were submitted to the EPA for review.

After several submissions and revisions, the EPA finally approved the plans and specifications for the sewage treatment plant on May 9, 1972. On

May 23, 1972, advertisements for bids were submitted. On July 11, 1972, the bids were received and publicly opened for the treatment plant and outfall line. On July 17, 1972, the construction contracts were awarded subject to the approval of the EPA. On September 20, 1972, a work order was issued to Christopher Construction Co. to begin physical construction on the treatment plant and on October 2, 1972, a work order was issued to C. F. W. Construction Company to begin physical construction on the outfall line.

The final cost of construction for the Dried Indian Creek project was $1,374,-432.69. The EPA has agreed to pay the City of Covington thirty-three per cent (33%) of this amount. The amount here in controversy is $302,375.19, or twenty-two per cent (22%) of the foregoing construction cost, representing the difference between the amount EPA has agreed to reimburse the City and the fifty-five per cent . (55%) amount to which the City believes it is entitled under Section 206 of the Act.

Plaintiffs' application for reimbursement for the sewage treatment costs here in dispute was originally submitted to the State of Georgia and later transmitted to the EPA. In a letter of July 20, 1973, plaintiff Dobbs informed the agencies that the dates on which actual initiation of construction began on the plant and lines were September 30, 1972, and October 17, 1972, respectively. On March 14, 1974, defendant Ravan notified plaintiffs that their application for reimbursement was denied because "initiation of construction" did not occur before July 1, 1972, as required by Section 206 of the Act. On April 2, 1974, plaintiff Dobbs noticed that he was making an administrative appeal from that decision based upon the definition of the word "construction." In a letter of May 14, 1974, Frances E. Phillips, Assistant Regional Counsel for EPA, informed plaintiffs that the only legitimate issues for appeal under the disputes clause of 40 C.F.R. § 35.895 were issues of fact. She further informed plaintiffs that be-cause the issue sought to be raised by them was a question of law, it was not appropriate for appellate review. This reimbursement suit was then instituted on October 23, 1974.

The plaintiffs have now moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. The defendants have filed a motion to dismiss, or, in the alternative, for summary judgment. The defendants move to dismiss the case on the grounds that 1) this Court lacks jurisdiction because plaintiffs failed to exhaust administrative remedies and 2) that the complaint fails to state a claim upon which relief can be granted. The parties agree that there is no genuine issue as to any material fact; however, they each contend that they are entitled to summary judgment as a matter of law.

## JURISDICTION

The defendants assert that this Court lacks jurisdiction in this matter as the plaintiffs have failed to exhaust their administrative remedies. In support of this contention defendants note that on June 26, 1973, notice of proposed rulemaking was published in the Federal Register as to the definition of "initiation of construction" applicable to Section 206 of the Act. Although the notice called for written comments before July 26, 1973, the plaintiffs in the instant case made no comments seeking to expand the definition to include the activities that plaintiffs now allege are included by that phrase. While not contesting the fact that they did not participate in the rulemaking process, plaintiffs assert that there is no legal requirement that they do so. Further, plaintiffs assert that they did "exhaust" their administrative remedies to the point where they were advised by EPA that further appeal was futile.

. While the defendants entitle their objection as a failure to exhaust administrative remedies, the basis of their objection is more an estoppel-type argument. The defendants contend that because the plaintiffs herein did not participate in

the rule-making process leading to the adoption of the agency definition, they may not now challenge that definition in this Court. This argument is without merit.

The fallacy of this argument can best be seen by assuming its validity. If the failure to participate in the rulemaking process estopped a litigant from bringing suit in Court challenging the rule adopted, then the vast majority of potential litigants could not sue. All persons would have to be on guard to insure that some agency did not promulgate some rule that might someday deny them a benefit to which they otherwise would have been entitled. As the agency herein noted, no one filed any comments to the proposed definition here in question. If one accepts the defendants' argument, then there is no one who may now challenge the definition adopted by the agency. That is, since no one participated in the rulemaking process, the rule would now be immune from attack. Such a result is neither desirable, nor is it the law. The two cases relied upon by the defendants simply do not support the position that they assert.

■■■ The two cases do, however, stand for the proposition that objections to standards should be made in the first instance to the administrative agency and that courts will not entertain objections not made in the agency proceedings. *United States v. L. A. Tucker Truck Lines, Inc.,* 344 U.S. 33, 73 S.Ct. 67, 97 L.Ed. 54 (1952); *Portland Cement Association v. Ruckelshaus,* 158 U.S.App. D.C. 308, 486 F.2d 375 (1973). The plaintiffs herein did present their objections to the definition adopted by the agency. They were advised that their objection to the regulation was "not a proper one for administrative review." The defendants have not brought to this Court's attention any evidence as to further agency avenues for review open to the plaintiffs. Therefore, they may challenge the regulation in this Court.

SUMMARY JUDGMENT

Section 206 of the Act, 33 U.S.C. § 1286, as amended, provides in pertinent part:

"Any publicly owned treatment works in a State on which *construction was initiated* after June 30, 1966, but before July 1, 1972, which was approved by the appropriate State water pollution control agency and which the Administrator finds meets the requirements of section 8 of this Act in effect at the time of the *initiation of construction* shall be reimbursed . . ." (emphasis added)

Section 212 of the Act, 33 U.S.C. § 1292, as amended, reads:

"As used in this subchapter—

(1) The term 'construction' means any one or more of the following: preliminary planning to determine the feasibility of treatment works, engineering, architectural, legal, fiscal, or economic investigations or studies, surveys, designs, plans, working drawings, specifications, procedures, or other necessary actions, erection, building, acquisition, alteration, remodeling, improvement, or extension of treatment works, or the inspection or supervision of any of the foregoing items."

The EPA regulation here in question, 40 C.F.R. § 35.890, provides:

"The phrase 'initiation of construction', as used in this subpart, means the issuance to a construction contractor of a notice to proceed, or, if no such notice is required, the execution of a construction contract."

This regulation was promulgated on September 18, 1973, some fourteen (14) months after the July 1, 1972, cutoff date in the statute. However, a longstanding regulation issued under Section 8 of the former Act, formerly 33 U.S.C. § 1158, defined the phrase "initiation of construction" to mean "the issuance of a notice to proceed, or, if no such notice is required, the execution of a construction contract." 40 C.F.R. § 35.805–1. The sole question for decision herein is

whether the City of Covington is entitled to reimbursement under the Act, as amended; that is, whether "construction was initiated" prior to July 1, 1972. The Court is of the opinion that "construction was initiated" within the meaning of the Act and that the plaintiffs are entitled to judgment as a matter of law.

As the issue involved in this case is one of statutory construction, the Court is required to attach substantial weight to the interpretation made by the agency which is charged with the statute's administration. *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). In *Ehlert v. United States,* 402 U.S. 99, 91 S.Ct. 1319, 28 L.Ed.2d 625 (1971), the Court stated:

> "[W]e are obligated to regard as controlling a reasonable, consistently applied interpretation if the Government's be such." (citations omitted) 402 U.S. at 105, 91 S.Ct. at 1323, 28 L.Ed.2d at 632.

On the other hand, while administrative agency regulations or guidelines are entitled to judicial deference, "they are not legally binding upon the Court." *Newmon v. Delta Airlines, Inc.,* 374 F.Supp. 238, 245 (N.D.Ga.1973). Administrative agency regulations are entitled to little or no deference where they do not comport with Congressional intent, *Espinoza v. Farah Mfg. Co.,* 414 U.S. 86, 94 S.Ct. 334, 38 L.Ed.2d 287 (1973), or where there exist with respect to the administrative regulation's construction of the controlling statute "compelling indications that it is wrong." *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371, 384 (1969). Finally, it is a familiar rule that the words of a statute are to be given their plain and natural meaning unless manifest injustice or absurdity would result. *See Holy Trinity Church v. United States,* 143 U.S. 457, 12 S.Ct. 511, 36 L.Ed. 226 (1892).

The controversy in the case *sub judice* is a very narrow one. The plaintiffs admit that if the EPA regulation is valid and controlling, then they are not entitled to reimbursement. The defendants admit that the actions of the plaintiff municipality fall within the term "construction" as defined in Section 212 of the Act, and ergo would qualify for reimbursement pursuant to Section 206 of the Act. The difference of opinion centers on whether in defining "construction" for purposes of the Act, the Congress meant something different for purposes of initially qualifying for reimbursement as opposed to the actual costs to be reimbursed.

The defendants maintain that Congress defined the term "construction" in Section 212 for the purpose of delineating "those costs associated with publicly owned sewage treatment works which may be reimbursed as construction costs." That is, a statutory definition was necessary because Congress intended to reimburse localities for items beyond the "brick and mortar" meaning of the word "construction." Therefore, the defendants agree that *if* the project here in question *qualified* under the Act, i. e., if "construction was initiated" before July 1, 1972, the actions taken by the plaintiff municipality would be reimbursable.

However, the defendants maintain that the phrase "on which construction was initiated" or "initiation of construction" establishes a second criterion which determines in the first instance whether *any* project costs qualify for reimbursement. That is, a necessary predicate for qualification under the Act is that "construction was initiated" prior to July 1, 1972; however, the fact that "construction" costs *were incurred* prior to July 1, 1972, is not in itself sufficient to constitute "initiation of construction." As a matter of argument, the distinction is ingenious. As a matter of common sense and plain language, it makes no sense at all.

The defendants support the distinction on several grounds. They maintain that the definition provided by Section 212 applies in those instances where the word "construction" appears separately from the phrase "on which construction was initiated." That is, the word "con-

struction" used separately establishes a criterion quite distinct from the one defined by the phrase. While the *word* is defined in the Act, the *phrase* is not. The rationale supplied by the defendants underlying this omission can be found by reference to the regulations promulgated by EPA under the Act as it existed prior to the Amendments of 1972. The Act prior to the Amendments contained the same definition of the word "construction." The regulations promulgated thereunder used the same definition of "initiation of construction." Therefore, by using the same word "construction" and the same statutory definition of that word, and by making reference to the requirements of the Act prior to amendment under which "initiation of construction" was defined separately in the regulations from the word "construction," the defendants conclude that Congress intended to approve the distinction.

The Court is unpersuaded. While the distinction between the "word" as opposed to the "phrase" might make sense as a statutory technique to implement a Congressional program, the Court finds absolutely no support for believing such was the intention here. "Construction" is defined in the statute to include the actions taken by the plaintiff municipality. Unless the intent is clearly to the contrary, the word should be read to mean what it is defined to mean whether it is found in a phrase or simply standing alone. A word is rarely used alone in a statute as normally sentences express one's intention much more lucidly. No particular reason appears as to why the phrases "on which construction was initiated" and "initiation of construction" should take on a different meaning. If they were meant to take on a different meaning, the obvious and simple thing for Congress to do was define them. The phrases to which the defendants attach so much significance are each used only once in the entire subchapter. They weren't defined because in and of themselves they were of no particular significance. Under the circumstances and in the absence of any evidence that Congress was even aware

of the administrative regulation, Congress' failure to revise the statute in the face of the regulation is of little value in support of the agency's position. *See, e. g. Zemel v. Rusk,* 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965).

Finally, defendants point to certain "inappropriate results" which they allege will occur if the plaintiffs' position is vindicated. First, communities that had performed economic and engineering feasibility studies in the statutory period, but never undertook any physical construction and do not contemplate construction, would still be entitled to reimbursement. This, defendants argue, would be contrary to the result contemplated by the Act which is actual functioning sewage treatment works. In the first place, whether a community under the circumstances outlined by the defendants would be entitled to reimbursement under the Act is not a question this Court must decide. In this case the end result was an "actual functioning sewage treatment works" and under the Act the plaintiff municipality was entitled to reimbursement. Secondly, insofar as the purpose of the legislation is "to assist the development and implementation of waste treatment management plans," economic and engineering feasibility studies which may not lead to actual construction, but assist in the development of future plans, would seem to come within the spirit of the Act.

Another "inappropriate" result cited by the defendants would be that communities that entered into construction contracts after June 30, 1966, would be ineligible for reimbursement if they performed economic or engineering feasibility studies in years prior to 1966. That is, since "initiation of construction" would have begun prior to June 30, 1966, these communities would not qualify under the Act. While perhaps correct, such a result is no more "inappropriate" than saying that communities which entered into construction contracts after July 1, 1972, but which had performed feasibility studies prior to that time, are ineligible for reimbursement.

The legislative history of Section 206 clearly shows that the purpose of this section was to provide a retroactive grant raising the Federal share on those projects initiated after June 30, 1966, as the full contribution to which they were entitled was not received. The Senate Report accompanying the Amendments to the Act reads in part:

"Under the 1966 Act, applicants were eligible for Federal contributions greater than 30 percent depending upon actions taken by the individual states in accordance with the provisions spelled out in the Act. In part because of the failure of Congress to appropriate adequate funds, many states did not create complementary financial assistance programs to qualify for the increased Federal share authorized by the 1966 Act.

The Committee concluded that the municipalities in such states should not be penalized by state inaction.

Thus, the bill authorizes projects constructed between July 1, 1966, and the enactment of this bill to receive a retroactive contribution that will provide Federal financing on all such projects up to the sum that the community would have received if it had received an initial 50 percent grant."

1972 U.S.Code Cong. and Admin.News, pp. 3699–3700.

Additional evidence which lends support to the plaintiffs' position is found in the legislative history of Section 203 of the Act. Under the conference substitute each stage in the construction of a waste treatment facility is treated as a separate project.

"Consequently, the applicant for a grant furnishes plans, specifications, and estimates (PS&E) for each stage (which is a project) in the overall waste treatment facility which is included in the term 'construction' as defined in section 212. Upon approval of the PS&E for any project, the United States is obligated to pay 75 percent of the costs of the project. Thus, for instance, the applicant may file a PS&E for a project to determine the feasibility of a treatment works, another PS&E for a project for engineering, architectural, legal, fiscal, or economic investigations, another PS&E for actual building, etc."

1972 U.S.Code Cong. and Admin. News., p. 3788.

What this change in procedures for paying the grants demonstrates is that *qualifying* for Federal money in the eyes of Congress did not have some different criterion such as "the issuance of a notice to proceed" or "the execution of a construction contract." Thus, approval of plans, specifications and estimates "to determine the feasibility of a treatment works" was felt sufficient by Congress to qualify for a grant. This is some indication that in referring to when "construction was initiated" before July 1, 1972, Congress clearly intended this to include construction activities as defined in Section 212 and intended to include the actions taken by the plaintiff municipality herein.

On the basis of the foregoing, the Court is of the opinion that the plaintiffs are entitled to a summary declaratory judgment in their favor. Under Section 206 of the Act the actions taken by the plaintiff municipality were sufficient to constitute "initiation of construction" prior to July 1, 1972. The Court denies the plaintiffs' prayer for an order of mandamus directing the defendants to pay over the stipulated sum. The Court is of the opinion that there is no compelling reason for the exercise of this extraordinary remedy at this time.