George H. NURNBERG, Petitioner,

v.

Robert F. FROEHLKE, Secretary of the Army, and Louis J. Prost, Commanding Officer of the United States Army Reserve Components Personnel and Administration Center, St. Louis, Missouri, Respondents.

No. 73 Civ. 21.

United States District Court,
S. D. New York.

Feb. 9, 1973.

Rabinowitz, Boudin & Standard, New York City, for petitioner; Joan Goldberg, New York City, of counsel.

Whitney North Seymour, Jr., U. S. Atty., for respondents; David P. Land, Asst. U. S. Atty., of counsel.

ROBERT L. CARTER, District Judge.

## MEMORANDUM OPINION

Petitioner applies for a writ of habeas corpus to compel his release from the

United States Army as a conscientious objector and also brings on by way of an order to show cause a motion for preliminary injunction staying his call to active duty status which had been scheduled to take place on January 8, 1973. A preliminary injunction was granted pending final determination on the merits. For reasons detailed below, I find that petitioner qualifies for release as a conscientious objector pursuant to AR 135–25 and that the military contrary determination was in error.

## SUMMARY OF PERTINENT FACTS

Petitioner, a citizen of the United States and resident of New York, was born in Germany in 1942. His mother was Jewish. Although entitled to classification as an "Aryan" under the nefarious standards then in effect in Nazi Germany, petitioner's father decided to share the fate of his Jewish wife. Both were subjected to persecution. Somehow all three—parents and petitioner—survived the hazards faced in Germany and came to this country as displaced persons in 1949 when Dr. Nurnberg was seven years old. Admittedly, the germination of Dr. Nurnberg's conscientious objector beliefs can be traced to this early experience.

Petitioner attended college and medical school in this country. In 1969 he enrolled in the Berry Plan, a program which places medical students in the Army Reserves and enables them to complete their medical training prior to being called to active duty. Petitioner has now graduated from medical school, completed his hospital residency and is a licensed physician and psychiatrist.

On October 25, 1971 petitioner applied for discharge from the United States Army Reserves as a conscientious objector. AR 135–25, which is the regulation controlling disposition of petitioner's application, provides in pertinent part:

"5 a. Consideration will be given to requests for discharge by reason of conscientious objection to participation in war, in any form, when such objection develops subsequent to the member's entry into military service, whether such entry was by induction, enlistment or appointment in any component of the Army.

b. Federal courts have held that a claim to exemption from military service under Selective Service laws must be interposed prior to notice of induction, and failure to make timely claim for exemption constitutes waiver of the right to claim. However, claims based upon conscientious objection growing out of experiences prior to entering military service, but which did not become fixed until entry into the service, will be considered.

c. Consideration will not be given for discharge based *solely* on conscientious objection which—

(1) Existed but was not claimed prior to member's initial entry into military service either by induction or enlistment or appointment in any component of the Army; * * *." (emphasis supplied).

Pursuant to this regulation petitioner applied for 1–0 classification (conscientiously opposed to participation in war in any form and to both combatant and noncombatant training and service in the armed forces). The requisite forms were completed, and submitted in support of his claims were letters from petitioner's mother, his rabbi, the Medical Director of the Manhattan Poverty Project where petitioner had worked and the Director of Psychiatric Training at St. Vincent's Hospital in New York City.

On or about February 12, 1972, petitioner was interviewed at Fort Totten, New York by a psychiatrist and a chaplain. The hearing with the investigating officer scheduled for the same day was cancelled, and petitioner was advised that the cancellation was the consequence of a change in regulation.

On or about June 3, 1972, new interviews took place. The chaplain, Captain

Donald N. Martin, concluded that Dr. Nurnberg was sincere in his conscientious objector beliefs and that these convictions were based "on the ethics and morals of the Jewish religion." The psychiatrist, Captain B. I. Feinberg, found that Dr. Nurnberg evidenced "no psychiatric disorder" and that his "current life style is seemingly consistent with his beliefs."

On June 7, 1972, Dr. Nurnberg was interviewed by Major Thomas J. Reddington, the investigating officer, in the presence of his attorney, counsel for him in this Court. Major Reddington in his report states that petitioner's attorney had taken longhand notes and had "approximately summarized most of the questions and answers." A copy of those longhand notes was attached to the Major's report and was, therefore, a part of the record in the case.

Major Reddington concluded that, based on analysis of all the evidence before him, Dr. Nurnberg was not "sincere in his beliefs" and that these beliefs had "crystallized prior to [petitioner's] entry into service." He, therefore recommended that petitioner's application be denied.

All of these documents (the application, letters in support, reports of the chaplain, Captain Martin, of the psychiatrist, Captain Feinberg, of the investigating officer, Major Reddington, together with summarization of the questions and answers at the June 7, 1973 interview, and a rebuttal of Major Reddington's report prepared by petitioner's counsel) constituted the record before the Conscientious Objector Review Board (CORB) when it reviewed the application. In addition, the reviewing authority had before it a letter dated 22 August 1972 from a Captain John L. Locke. In this letter Captain Locke concurred in the views of the investigating officer and recommended disapproval on the grounds that petitioner's claimed beliefs were "based upon expediency and that alleged beliefs apparently existed but were not claimed prior to initial appointment." In addition, Captain Locke

added that petitioner's "application was not submitted until no further delay was authorized. There is no record on file of his declination of promotion as promulgated (sic) in his application." It does not appear that Captain Locke's letter had been seen by petitioner prior to its being forwarded to the Review Board.

On September 27, 1972, the Board, after reviewing the above documents, held that Dr. Nurnberg failed to qualify for 1–0 classification since his conscientious objector beliefs existed but were not claimed prior to petitioner's entry into military service. It based this determination on certain specified statements in petitioner's application and in the supporting letters and on the finding of prior crystallization in Major Reddington's report.

## SCOPE OF REVIEW

■ Court review of a military determination is strictly limited to (1) a determination of whether petitioner's entitlement to substantive and procedural due process has been infringed and (2) ascertainment of whether there exists a basis in fact for the denial of petitioner's application.

## SUBSTANTIVE AND PROCEDURAL DUE PROCESS ISSUES

It is alleged that petitioner's rights of substantive and procedural due process have been violated because: (1) the Army failed to set forth the reasons for the denial of the application in its letter to petitioner notifying him that his application had been denied; (2) procedures set forth in AR 15–6 were not followed; and (3) reliance was placed by the Conscientious Objector Review Board upon a report by Captain Locke which petitioner had not been permitted to see or rebut.

### The Letter of Notification

In the letter dated November 2, 1972, from Lt. Col. Billy LaFever, Office of the Adjutant General, U. S. Army Reserve Components Personnel and Admin-

istration Center, petitioner was advised that "[t]he facts and documents presented in your behalf have been carefully considered by the Department of the Army Conscientious Objector Review Board convened at this headquarters. Your request for discharge by reason of conscientious objection is hereby disapproved due to the failure to meet the criteria outlined in AR 135–25." While no copy of the Board's decision was enclosed, there is no evidence that petitioner encountered any difficulty in obtaining a copy of the decision. Indeed, a copy of the Board's determination is submitted among the papers petitioner filed in this case.

 Moreover, it is not disputed that the reviewing authority set forth with specificity its reasons for denying the application. The cases relied upon by petitioner do not require that the Army detail the bases for decision in its notice to the applicant. They hold, rather, that the administrative tribunal must, as was done in this case, specify the reasons for its decision in order to facilitate review.

"'[I]t is important for courts to know the ground upon which the board acted.' Paszel v. Laird, [426 F.2d 1169] at 1175 . . .. Court review 'must be meaningful in the sense that it must encompass a record from which a court can determine whether there was a basis in fact for decision, what that basis was and whether the board applied the correct legal standard.' United States v. Morico . . . 415 F.2d [138] at 143." United States v. Lenhard, 437 F.2d 936, 937 (2d Cir. 1970).

Enclosing a copy of the decision in the notice to petitioner that his application had been denied, or in the alternative setting forth in the letter a summary of the bases for the denial, would appear to be more consonant with the requirements of orderly procedure than what was actually done. Petitioner, however, did obtain a copy of the decision in sufficient time to include it in his petition filed in this Court, and there is no evidence that he suffered any actual injury by the failure to receive a copy of the decision in the November 2, 1972 letter. I find, therefore, no infringement of due process rights in respect of this issue. *A.R. 15–6*

 In Friedberg v. Resor, 453 F.2d 935 (2d Cir. 1971) it was held that AR 135–25, which included by reference the due process requirements of AR 15–6, mandated that servicemen claiming conscientious objector status be afforded the right

"'. . . to a hearing, to notice of that hearing, to challenge members of the board for cause, to inspect all records and documents referred with the case and not subject to security requirements, to have counsel present at the hearing, to rebut any adverse allegations presented, and to submit a written brief covering the whole or any portion of the case under investigation." 453 F.2d at 938 (citations to AR 15–6 omitted.)

for the reason that military regulations prescribing specific procedural guarantees had to be strictly adhered to. What safeguards were necessitated pursuant to the standards of "fundamental due process" was not decided (453 F.2d at 938). Before decision was reached in *Friedberg*, AR 135–25 was amended to exclude all reference to AR 15–6. Consequently AR 135–25 as amended must be evaluated in reference to its consonance with the standards of "fundamental due process."

In Crotty v. Kelly, 443 F.2d 214 (1st Cir. 1971), it was held that "fundamental due process" entitled an in-service conscientious objector applicant to an opportunity to examine and respond to the recommendations which are to be considered by the reviewing authority in ruling on his petition. In reaching its determination in the *Crotty* case, the First Circuit relied upon Gonzales v. United States, 348 U.S. 407, 75 S.Ct. 409, 99 L.Ed. 467 (1955), which had made a similar determination in a case

involving a Selective Service conscientious objector applicant, and upon Ehlert v. United States, 402 U.S. 99, 91 S.Ct. 1319, 28 L.Ed.2d 625 (1971) in which the Court had held that in-service conscientious objectors should be given

"a full and fair opportunity to present the merits of their conscientious objector claims for consideration under the same substantive criteria that must guide the Selective Service System." 402 U.S. at 103, 91 S.Ct. at 1323.

The First Circuit concluded that "at the very least such an opportunity must embrace the rights to know the case against one and to attempt to meet it via the written word." 443 F.2d at 217.

█ AR 135–25 was revised in March, 1971; petitioner's claim was presented in October, 1971, but at the time he submitted his application, petitioner was given a copy of AR 135–25 as it read prior to amendment. Petitioner contends that he is, therefore, entitled to have the AR 15–6 standard applied in his case.

I disagree. Petitioner has not established that he was prejudiced in any way in being mistakenly mailed a copy of the unrevised regulation. There is no holding of which I am aware which goes further than *Crotty* in the interpretation of fundamental due process as applied to military proceedings. Petitioner was given a hearing before Major Reddington, the investigating officer. Plaintiff's counsel was permitted to be present and to summarize the questions and answers given during the hearing. Moreover, the relative accuracy of counsel's sumarization was attested to by Major Reddingon and that summary was sent to the Conscientious Objector Review Board. Thus, it was among the documents considered by the Board in making its decision.

█ Petitioner was afforded full and fair opportunity to present the merits of his claim and, except for the Locke report, which is discussed below, he was permitted to examine and re-

spond to the report presented to the reviewing authority. The claim that failure to publish AR 135–25 as amended in the Federal Register renders it inoperative is without merit. Pifer v. Laird, 328 F.Supp. 649 (N.D.Calif.1971). On balance, the procedure followed seems to have met the standards of fundamental fairness as those standards have been applied to the military.

*The Locke Report*

█ There can be no doubt after *Crotty, supra,* that petitioner was entitled to an opportunity to review and rebut Captain Locke's report prior to its submission to the Board. In questioning the sincerity of petitioner's belief and in arguing that these beliefs existed but were not claimed prior to enlistment in the Berry Plan, the report is no more than an adoption of the views expressed by the investigating officer. The latter views petitioner saw and their rebuttal by his counsel were among the documents considered by CORB.

Captain Locke's report, however, includes matters not in Major Reddington's report. Captain Locke's allegations that petitioner's conscientious objector status was not claimed until no further delay in calling petitioner to active duty could be authorized, and that there is no record of petitioner's declination of promotion as stated in his application constitute new matter. Petitioner had no opportunity to see this statement or respond to it.

While these two observations go to the issue of the sincerity of petitioner's beliefs and final decision was not placed on that ground, we cannot be certain of the effect the report had on the Board's determination. The failure to afford petitioner the opportunity to examine and respond to Captain Locke's report must be considered a clear denial of his due process rights. However, since in my view there is no basis in fact for the Review Board's denial of petitioner's application, this infraction diminishes to insignificance.

## BASIS IN FACT

*CORB's Decision*

Both the investigating officer and Captain Locke question the sincerity of petitioner's belief. Denial of the application does not rest on that ground. Indeed, there are no objective facts in this record on which a successful challenge of petitioner's sincerity can be supported. The application is denied on the grounds that petitioner's views had crystallized before his enlistment in the Army under the Berry Plan. Thus, by necessary implication, the Board has concluded that petitioner is a conscientious objector. The sole question presented here, therefore, is whether the military determination that petitioner's claim has come too late is supported by the record.

▇ If a basis in fact exists, the military decision must be sustained. As the Second Circuit explained in United States ex rel. Checkman v. Laird et al., 469 F.2d 773, decided Oct. 27, 1972, this limited scope of review does not mean that the military decision must prevail where there is only a scintilla of evidence to support it. Nor does it mean that the military is free to distort the record, to take statements which out of context might support the decision in disregard of statements compelling a contrary result. *Checkman, supra,* at p. 783. The basis in fact standard requires upon an examination of the record as a whole that there be objective facts which provide a rational factual basis for the military determination.

Here it must be remembered that the regulation bars C.O. status to military personnel when the evidence reveals the application is "based *solely* on conscientious objection which (1) Existed but was not claimed prior to [applicant's] initial entry into military service . . ." AR 135–25(5)(c) (emphasis supplied). Thus, although petitioner's convictions may have begun to mature early in life and before any connection with the military, he can be denied conscientious objector status under the reg-

ulations only if these convictions crystallized prior to his enlistment under the Berry Plan.

*The Documents Before CORB on Which it Relied*

Dr. Nurnberg's application was supported by a letter dated October 24, 1971 over his signature and letters from his mother, his rabbi, Dr. Robert Morgan and Dr. Hanin. Dr. Nurnberg begins his letter by stating:

"To serve in any military organization, in any capacity, is morally unconscionable to me and becomes increasingly so with every passing day. This awareness makes it profoundly difficult for me to live with myself and function constructively in this society. Coming to this moment has not been by sudden revelation, but rather the culmination of life experiences which have come to maturation at this conclusion. This process of maturation required deep introspection and review of my life experiences."

Dr. Nurnberg then goes on to explain that he had been born in Munich, Germany in 1942; that as a Jew, he, along with his parents, had been the objects of Nazi persecution; that he migrated to this country at age seven and considers the survival of himself and his family as "an act of God and our faith in him;" that as a child he was imbued with the sanctity of human life; that he could never hunt, fish or accept animal capture without retribution of conscience; that such convictions became such a part of his childhood that he could not engage in games of play acting involving shooting, fighting or killing; and that his choice of medicine as a career was a natural result of his religious beliefs and training. On completion of medical school when confronted with his military obligation, "the nightmares and retribution by conscience" recommenced and as his deferment ended ."the attack of conscience is relentless."

He concludes his letter by stating that to "be a part of a military establishment . . . is unconscionable and cannot

be reconciled . . .. The sanctity of human life is irreconcilable; nothing can justify the taking of a life other than an act of God, its creator."

In the attached form, which applicants for conscientious objector status are required to complete, are statements indicating that petitioner's beliefs had their genesis in the fear, suffering and persecution to which he and his family were subjected during his childhood and in their seemingly miraculous escapes from death and final migration to safety in this country. Petitioner attended synagogue and Sunday School as a child. College provided the intellectual justification and nourishment for his beliefs. While in college he supported civil rights, opposed nuclear arms proliferation, military intervention and capital punishment. He hoped for alternate service in the Public Health Service and when that did not happen, he enlisted in the Berry Plan. He had the unrealistic hope that he might not be called; that as a member of the medical corps he would be preserving life. Finally faced with the call to active military duty, he states he finds that he can no longer "rationalize that [he] will not be re-

quired to kill. Service is unconscionable . . . and cannot be accepted any longer."

The letter from petitioner's rabbi, Dr. Joachim Prinz is dated September 22, 1971. In it Dr. Prinz states that petitioner was always opposed to any kind of warlike involvement, and as the conflict in Vietnam progressed, petitioner became more profoundly convinced that he would not be able to serve within the military system.

In a letter dated 13 September 1971, Dr. Edward Hanin, Director of Psychiatric Training at St. Vincent's Hospital in New York asserts that petitioner's "negative feelings with regard to military service and his personal aversion to combat and war are deeply felt and long standing." The Board excerpts statements from some of the above documents to support its holding of prior crystallization.[1]

In addition, the Board relied upon that portion of Major Reddington's recommendations which states that petitioner's views had existed and become fixed prior to his Army enlistment.[2]

The Board rests its denial of the application on the stated reason that

1. There is a letter dated December 3, 1971 from petitioner's mother in which Mrs. Nurnberg states that she had advised her son that he would never in life be required to wear a uniform; that he was never permitted to play with soldiers or fight with other children; that she has been very upset since petitioner registered for the draft at age 18 and has "been living in fear that he must go into the Army. My son gets very upset because he cannot possibly serve in the military." There was also a letter from petitioner's superior, a Dr. Edward Morgan, on a project where he was employed. Neither the mother's nor Dr. Morgan's letter was cited by the Board in support of its determination.

2. Major Reddington based his conclusion that Dr. Nurnberg was not sincere in his beliefs and these beliefs had crystallized prior to petitioner's entry into service upon Dr. Nurnberg's statement that his great-grandfather and grandfather were conscientious objectors; that they in turn had influenced petitioner's mother's belief which, of course, affected petitioner; pe-

titioner's assertion that college had become "the basis for the intellectual realization of his feelings" which became "concrete at that time;" petitioner's active involvement during college in the "ban the bomb" movement; opposition to military intervention in Southeast Asia and involvement in peace group efforts; the letter from petitioner's mother pointing out that "her son had been upset from the time he had to register for the draft" at age 18 "because he cannot possibly serve in the military;" the letter from Dr. Hanin, Director of Psychiatric Training at St. Vincent's Hospital which states that petitioner's "negative feelings with regard to the military . . . are deeply felt and long standing;" and the statement in Rabbi Prinz's letter that he had known petitioner since childhood and that petitioner "was always opposed to any kind of warlike involvement. As things developed in Vietnam, he became much more profoundly convinced that he would not be able to serve within the military system."

"[t]hroughout his application [petitioner] strongly indicates that his alleged conscientious objector beliefs existed long before his initial entry into military service in 1969 . . .."

In support of its conclusion, the Board quotes some of petitioner's statement concerning his childhood aversion to violence, his involvement in civil rights activities and the peace movement during his college years, his enlistment in the Berry Plan with the hope he would not be called and statements from the letters of Dr. Hanin and Rabbi Prinz attesting to the long standing nature of petitioner's aversion to warlike involvement.

### Evaluation of the Decision of the Conscientious Objector Review Board

In Lovallo v. Resor, 443 F.2d 1262, 1264 (2d Cir. 1971), the Court pointed out that the basis in fact criterion requires a finding of "objective evidence affording a rational basis for the Board's refusal to accept the validity of the applicant's claims." The Board is bound by the fair implications of the language in the record and cannot take sentences out of context, and thus distort their meaning. *Checkman, supra*, 469 F.2d at 783–784.

Nor can the military decision be upheld merely because of evidence disclosing that applicant's religious beliefs existed prior to entry into the armed forces. Helwick v. Laird, 438 F.2d 959 (5th Cir. 1971); United States ex rel. Healy v. Beatty, 424 F.2d 299 (5th Cir. 1970), aff'g., 300 F.Supp. 843 (S.D.Ga.1969). Thus, the evidence that petitioner had strong religious beliefs dating from childhood; that he could not as a child engage in activities, games or fantasies related in any way to killing, fighting or violence is an insufficient basis on which to deny petitioner's application. AR 135–25 forbids conscientious objector status to persons whose conscientious objector beliefs were fixed but not claimed prior to entry into the military.

Petitioner states that his conscientious objector beliefs did not crystallize until he was finally confronted with the call to active duty status. Faced with that prospect he states the attack of conscience "became relentless." In the interview with the investigating officer, petitioner was asked when he became a conscientious objector, and the following colloquy took place:

"There was no single event that made me a C.O. I just was not satisfied with the kind of compromise I had made. I suppose I had been practicing some form of denial and I was able to convince myself that as a doctor I would be serving humanity. I was very conflicted but I believed that I would not be involved in the war, although I would be a doctor in the Army. I applied for the Berry Plan and I got a one year deferment and then another year and then another year.

"Hadn't this process matured at the time you enlisted in the Berry Plan?

"No, I was opposed to war, but I felt a commitment to this country and I believed that as a physician I would be able to serve.

"Don't you feel that way now?

"No, it wasn't a satisfactory feeling for me. I became nervous and upset. I began having nightmares after I enlisted. When I received letters from the Army I became very upset.

"But you could have registered as a C.O. then.

"I was not a C.O. then. I was having doubts but I wasn't a C.O. I felt strongly about the military and I discussed my doubts with my chief at St. Vincent's. I was encouraged to continue and I did. It was only at the end of my second year of residency that I realized that I couldn't do this anymore. I couldn't come to peace with myself until I stood up as a C.O.

"You would be helping soldiers who are maimed in battle. Couldn't you do that?

"No, I would be unable to perform in the military."

■ The fact that petitioner sought to avoid the confrontation with his conscience by enlisting in the Berry Plan in the belief that as a doctor he would not be involved in warlike activities, that he would thereby be serving humanity or might not be called is not sufficient grounds for denying the application. While these views may seem unrealistic, and a self-interest motivation might be discerned in his actions, "we cannot blind ourselves to the reality that a generous dollop of self-interest motivates many," *Checkman, supra,* 469 F.2d at 785, who enlist in the Berry Plan.

In Helwick v. Laird, *supra,* plaintiff had obtained a non-combatant classification prior to induction from Selective Service. Thereafter, while in the Army he applied for discharge as being conscientiously opposed to any form of military participation. This application was denied. The Fifth Circuit in applying the basis in fact standard stated that there must be some "hard, provable, reliable facts" in the application that provide a basis for disbelieving the applicant.

■ While there is no doubt that petitioner's religious beliefs and views concerning the sanctity of life had existed prior to his entry into the Army, these considerations are of no relevance. The term "solely" in the regulation must be given effect. United States ex rel. Barr v. Resor, 143 U.S.App.D.C. 292, 443 F.2d 707 (1971) aff'g., 309 F.Supp. 917 (D.C.1969); Adams v. Davidson, 331 F.Supp. 612 (N.D.Calif.1970). What has to be determined is whether on this record there is a basis in fact for disbelieving petitioner's claim that his conscientious objector beliefs became fixed only when faced with the call to active service. I think there is none.

■ A fair interpretation of the record reveals the development from petitioner's childhood of strong religious beliefs and aversion to violence and warlike activities. These emotional reactions of early youth were intellectualized in college where petitioner actively supported civil rights and peace efforts. This does not necessarily or even usually mean, however, that petitioner had reached the point of commitment as a conscientious objector. Many people hold to petitioner's views concerning the sanctity of life and are opposed to violence on both emotional and intellectual grounds. Many such persons may also be civil rights and peace activists, without being conscientious objectors. While such persons and conscientious objectors may overlap and sometimes coalesce in respect of their views and philosophical outlook, the two are not coterminous. Something more is required to render one a conscientious objector than opposition to violence, support for peace and civil rights. As the court stated in Rabbito v. Larsen, No. C–70 572 (N.D.Calif. 8/19/70) (cited in Adams v. Davidson, *supra,* 331 F.Supp. at 614) "[m]any people intellectually have knowledge of the horrors of war, and intellectually they have knowledge that war is a violation of the Commandment 'Thou Shalt Not Kill,' but until they go through [the] actual experiences relating to war, they may not feel the emotional compulsion to reject their own participation in [the] war."

It is patently clear on this record that such a process of emotional and intellectual maturation was taking place in petitioner's case. He was torn between his beliefs and convictions and the sense of citizenship obligation to his adopted country. Indeed, the sense of duty to country and guilt in not being able to do what was expected of him was probably stronger and deeper in view of petitioner's personal experiences, than if he had been born in this country and had never been exposed to the horrors of life as a Jew in Nazi Germany. Petitioner's situation cannot be given a true reading without taking into account these intangible but intensely human considerations.

He sought to avoid facing up to the inevitable implications of his beliefs until it could no longer be avoided. There is nothing unusual or suspect about that.

To paraphrase a statement in Silberberg v. Willis, 306 F.Supp. 1013, 1021 (D. Mass.1969), rev'd. on other grounds, 420 F.2d 662 (1st Cir. 1970), the reviewing authorities in this case failed to take into account the fact that many conscientious objectors whose sincerity cannot be questioned may postpone final commitment until there is no other alternative.

Reliance on what was said in Dr. Prinz's and Dr. Hanin's letters as evidencing prior crystallization of petitioner's belief is both misplaced and unfair. "Deriving the petitioner's past state of mind from the ambiguous language of another's letter, falls well short of providing a reasonable and affirmative basis" for the Board's determination. Cotton v. Laird, 3 SSLR 3307, 3308 (D.N.J.1970). Nor can a basis in fact ingredient be found in the letter of petitioner's mother. Often one's family and close friends may discern in observing the emotional and intellectual conflict and development of the sort at issue here that the Rubicon has been crossed long before the individual in question is conscious that he has reached that critical decision.

Petitioner claims that his conscientious objector views are of recent maturation, and there are no concrete objective facts on this record that substantially cast doubt on the credibility of that assertion. Cf. Kessler v. United States, 406 F.2d 151, 156 (5th Cir. 1969). Since the Board does not question the sincerity of petitioner's belief, he has made out a very strong *prima facie* case. National policy clearly favors allowing those with truly held conscientious objector beliefs to avoid military service. What is involved here, therefore, is in essence a technical issue —did petitioner waive his right to exemption from military service as a conscientious objector by making his assertion too late. Under these circumstances the Army is required to support its denial of the application with objective facts that strongly and persuasively support the conclusion that a waiver took place. In my judgment, no fairminded reading of this record can support the Army's determination. The petition is granted.

So ordered.