George H. NURNBERG, Petitioner-Appellee,

v.

Robert F. FROEHLKE, Secretary of the Army, and Louis J. Prost, Commanding Officer of the United States Army Reserve Components Personnel and Administration Center, St. Louis, Missouri, Respondents-Appellants.

No. 92, Docket 73-1538.

United States Court of Appeals, Second Circuit.

Argued Nov. 20, 1973.

Decided Dec. 28, 1973.

844

Joan Goldberg, New York City (Rabin-owitz, Boudin & Standard, New York City), for petitioner-appellee.

David P. Land, Asst. U. S. Atty. (Paul J. Curran, U. S. Atty., Southern District of New York, Joseph P. Marro, Asst. U. S. Atty., of counsel), for re-spondents-appellants.

Before LUMBARD, MANSFIELD and MULLIGAN, Circuit Judges.

MULLIGAN, Circuit Judge:

George H. Nurnberg was born in Munich, Germany in 1942. His father was Catholic, his mother was Jewish, and he was brought up in the Jewish faith. His family was persecuted by the Nazis during World War II. They lived in fear and terror of Gestapo apprehen-sion but finally managed to reach the

United States in 1949. His education was in the public school system of New York. He graduated from Queens College in 1964, and from the Upstate Medical Center in Syracuse, New York, in 1968. Dr. Nurnberg interned from June, 1968, until July, 1969, at the Cornell North Shore Memorial Hospital in Manhasset, New York. From July, 1969, to July, 1971, he was a resident psychologist at St. Vincent's Hospital in New York City. He later practiced medicine privately. During his internship in February, 1969, at the age of 27, Nurnberg voluntarily enlisted in the United States Army Reserve, receiving a commission as a Lieutenant, pursuant to the Berry Plan. The Berry Plan is a military program made available to medical students which permits them to join the Army Reserve as commissioned officers and to postpone active duty until medical studies are completed.

In July, 1971, Nurnberg completed his studies and in October, 1971, applied for discharge as a conscientious objector. His application was finally denied by the Conscientious Objector Review Board (Board) in September, 1972, and he was ordered to active duty beginning January 8, 1973. The basis for denial was not that petitioner was not a conscientious objector, but that his conscientious objector beliefs had become crystallized and were fixed prior to his voluntary enlistment in the Army in February, 1969. Paragraph 5(c) of Army Regulation 135–25 provides that consideration will not be given to requests for discharge based solely on conscientious objection which existed, but was not claimed, prior to the member's initial entry into military service.

On January 3, 1973, Dr. Nurnberg filed a petition for a writ of habeas corpus and an order to show cause why a preliminary injunction should not issue, staying his orders to report for active duty as a physician with the United States Army. The motion for a preliminary injunction was heard on January 5, 1973, before Hon. Robert L. Carter, United States District Judge, Southern District of New York. By memorandum decision dated January 8, 1973, a preliminary injunction was issued. The respondents submitted a written memorandum in opposition to the petition, and the writ was granted by Judge Carter on February 9, 1973 (355 F.Supp. 1187). No evidentiary hearing was held. This is an appeal by the respondents seeking that the order below be vacated and that the petition for writ of habeas corpus be dismissed.

I

In support of his application for conscientious objector status, Dr. Nurnberg, pursuant to regulation, filed a written statement in which he set forth his religious training and beliefs, and provided letters of reference from his mother, two doctor friends and a Rabbi. In February and June, 1972, he was interviewed at Fort Totten, New York, by a chaplain, Captain Donald N. Martin, who concluded that he was sincere in his conscientious objector beliefs and that these convictions were based "on the ethics and morals of the Jewish religion." A psychiatrist, Captain B. I. Feinberg, found that the petitioner had no psychiatric disorder and that his "current life style is seemingly consistent with his beliefs." On June 7, 1972, Major Thomas J. Reddington, the Investigating Officer, interviewed Dr. Nurnberg in the presence of his counsel, who has represented him throughout the proceedings in the federal courts. Major Reddington's report, dated July 21, 1972, states in part:

> I do not think that applicant is sincere in his beliefs. I am convinced that applicant's beliefs crystallized prior to his entry into service. This is evident, both from an analysis of his testimony at the hearing, and from his application and supporting papers.

Major Reddington's conclusion was based on the following evidence:

1. Petitioner stated at the hearing that both his grandfather and father were conscientious objectors, that they had influenced his mother and her be-

liefs, and that they in turn had affected his.

2. Dr. Nurnberg further stated that during college he had achieved an intellectual realization of his feelings which "became concrete at that time."

3. While in college, he was actively involved in the "ban the bomb" movement, was opposed to military involvement in Southeast Asia and participated in peace marches and fund raising for peace groups in April and May of 1968.

4. The letter from Dr. Nurnberg's mother stated that her son had been upset from the time he had registered for the draft (presumably in 1961) because "he cannot possibly serve in the military." She further stated that "he was brought up by his parents as being opposed to the military and to stick to his beliefs and conscience."

5. The letter from Dr. Hanin, Director of Psychiatric Training at St. Vincent's Hospital, stated: "I can assure you that his negative feelings with regard to military service . . . and war are deeply felt and long standing."

6. The letter of Rabbi Joachim Prinz stated that he had known the applicant since his childhood and further stated that the applicant "was always opposed to any kind of warlike involvement. As things developed in Vietnam, he became much more profoundly convinced that he would not be able to serve within the military system."

Major Reddington's report concluded:

From the answers given by applicant at the hearing, from his own statements in his application and from his supporting references, I can only conclude that his objection developed and existed prior to applicant's entry into military service.

I recommend denial of any classification as a conscientious objector for the reason that applicant is not sincere in his beliefs. In my judgment, applicant's beliefs became fixed and definite prior to his entry into service.

A copy of Major Reddington's report was forwarded to petitioner's counsel who submitted a reply memorandum to the Department of Defense.

On August 22, 1972, Captain John L. Locke, Personnel Actions Division, in a one-page report, concurred with the recommendation of the Investigating Officer on the basis of the evidence that Nurnberg was opposed to the military, and that his conscientious objector beliefs had existed prior to his initial appointment. On September 27, 1972, the Conscientious Objector Review Board unanimously recommended disapproval of Nurnberg's application.

In addition to the evidence already indicated, the Board made reference to Nurnberg's application for C.O. status in which he stated:

Confrontation with military service again produced the nightmares, depression and anxiety I felt as a child. I hoped for alternate service by [sic] the Public Health Service, but was not chosen. I enlisted in the Berry Plan. I had the unrealistic hope that I might not be called.

By letter dated November 2, 1973, Nurnberg was advised of the decision of the Board, and was given orders to report for active duty at Fort Sam Houston, Texas, on January 8, 1973.

II

■■ The court below set forth the proper test to be applied in reviewing the determination of the Board: "[W]hether on this record there is a basis in fact for disbelieving petitioner's claim that his conscientious objector beliefs became fixed only when faced with the call to active service." 355 F.Supp. at 1197. This is admittedly a narrow test. Ames v. Laird, 450 F.2d 314, 315 (9th Cir. 1971) (per curiam); United States v. Corliss, 280 F.2d 808, 810 (2d Cir.), cert. denied, 364 U.S. 884, 81 S.Ct. 167, 5 L.Ed.2d 105 (1960). A court is not to substitute its judgment on the weight of the evidence for that of the designated agency. Witmer v. United

States, 348 U.S. 375, 380–381, 75 S.Ct. 392, 99 L.Ed. 428 (1955). If there is objective evidence, even though not preponderant or substantial, the finding must be sustained. United States ex rel. Donham v. Resor, 436 F.2d 751, 753 (2d Cir. 1971).

Although the court below announced in its opinion that the proper standard of review was the "basis in fact" test, it went on to state:

> Since the Board does not question the sincerity of petitioner's belief, he has made out a very strong *prima facie* case. National policy clearly favors allowing those with truly held conscientious objector beliefs to avoid military service. What is involved here, therefore, is in essence a technical issue—did petitioner waive his right to exemption from military service as a conscientious objector by making his assertion too late. Under these circumstances the Army is required to support its denial of the application with objective facts that strongly and persuasively support the conclusion that a waiver took place.

355 F.Supp. at 1198.

 The conclusion of the court below that the Army has the burden of strongly and persuasively establishing that the petitioner had waived his C.O. status by not claiming it when he enlisted, lacks support in any cited authority and we have not found any. Compare Ward v. Volpe, 484 F.2d 1230, 1235 (9th Cir. 1973). In fact, it is a repudiation of the "basis in fact" test,* which has been traditionally applied in late crystallization cases as it has in all other conscientious objector cases. See, e. g., Polsky v. Wetherill, 455 F.2d 960, 962 (10th Cir. 1972); Grubb v. Birdsong, 452 F. 2d 516, 519 (6th Cir. 1971); Morrison v. Larsen, 446 F.2d 250, 256 (9th Cir. 1971); Bolen v. Laird, 443 F.2d 457, 460 (2d Cir. 1971); Helwick v. Laird, 438 F.2d 959, 965 (5th Cir. 1971). The statement that the Board does not question the sincerity of petitioner's belief is somewhat ambiguous. The Board, of course, concluded that Nurnberg was a conscientious objector but that he hid his beliefs in order to gain the advantages of the Berry Plan, and that therefore he was not sincere in stating that he was not a conscientious objector when he enlisted in the Reserve. This is what the case is all about. There is no "national policy" that we know of which permits the true conscientious objector to hide his beliefs in order to obtain the advantages of a commission, and then when called to serve, suddenly to advert to his conscience. The obligation of the conscientious objector is to give timely notice of his reservations and this is provided for in the regulations. A.R. 135–25; Grubb v. Birdsong, *supra*, 452 F.2d at 519; Morrison v. Larsen, *supra*, 446 F.2d at 253–256; see Ehlert v. United States, 402 U.S. 99, 101–104 & n. 7, 91 S.Ct. 1319, 28 L.Ed.2d 625 (1971); United States v. Kline, 354 F.Supp. 931, 938 (M.D.Pa.), aff'd, 474 F.2d 1337 (3rd Cir. 1972). We find that there was ample basis in fact to support the finding that the petitioner's conscientious objector views had ma-

---

* It is understandable that Nurnberg has urged on appeal that we in fact reject this narrow criterion of review:

> It is time to discard the "basis in fact" standard. It is an anacronism [sic] that is sometimes used to deny a claim when the court itself recognizes the insufficiency of the Army basis.

We decline the invitation and do not believe the criticism to be valid. Proper application of the basis in fact standard requires courts to strike down unsupported and conclusory determinations of an official or board (See Ferrand v. Seamans, 488 F.2d 1386 (2d Cir., 1973)), but at the same time, it serves the salutary purpose of precluding the courts from sitting as *de novo* tribunals (see United States v. Orr, 474 F.2d 1365, 1368 (2d Cir.), cert. denied, 414 U.S. 871, 94 S.Ct. 95, 38 L.Ed.2d 90 (1973)).

tured and had become fixed sometime prior to his enlistment, and, further, that the court below committed error in applying a standard which would impose the burden on the Army to establish this fact "strongly and persuasively."

The basis in fact consists of the petitioner's statements, as well as those of his references, which are set forth in Major Reddington's report and the decision of the Board. While petitioner makes the self-serving statement that his views did not become fixed until he was faced with the prospect of active service, he also expressed the view that when he enlisted, he "had the unrealistic hope that he might not be called." This, together with the fact that he points to no event or experience (such as combat training or firearms instruction) during his Berry Plan shelter period which triggered a crystallization, strongly suggests that the C.O. status of Nurnberg had blossomed long before enlistment. His childhood memories and religious upbringing would support an earlier maturation than Nurnberg now claims. We cannot ignore the opinions of those who knew the petitioner best, who have no motive to dissimulate and who sincerely believed that his conscientious objector views were long standing.

### III

■ Petitioner claims that the Army failed to follow its own regulations and denied him procedural due process because, *inter alia*, it failed to forward to him the report of Captain Locke, who is deemed to be his Commanding Officer for the purposes of the regulations (see Friedberg v. Resor, 453 F.2d 935, 936 & n. 1 (2d Cir. 1971)). The Army does not contest what it terms a "procedural irregularity." The court below found that the petitioner was afforded a full and fair opportunity to present the merits of his claim and that all procedures met appropriate standards of fairness. 355 F.

Supp. at 1193. The court below did, however, find a violation of due process standards in the failure to submit to the petitioner a copy of the Locke report. 355 F.Supp. at 1193. We cannot agree. It is basic that the petitioner here must establish harm or prejudice as a result of the failure to apprise him of the content of Locke's report. United States v. Bellmer, 404 F.2d 132, 135 n. 6 (3d Cir. 1968); see United States v. Ford, 478 F.2d 169, 174–175 (1st Cir. 1973); Antonuk v. United States, 445 F.2d 592, 597–598 (6th Cir. 1971). This Nurnberg has failed to do. The Locke report was substantially based on the hearing and report of Major Reddington, which was supplied to him and to which a rebuttal was entered. While the decision of the Board did refer to the fact that it considered the Locke letter, its recommendation of denial was grounded upon the evidence summarized in Major Reddington's report. There is no point raised in the Board's decision which relied on the letter of Captain Locke or which was not known to the petitioner here.

The only data found in Captain Locke's report which was not covered in Major Reddington's report was that the Army had been liberal in granting Nurnberg additional delays to complete his full residency program, that his application for discharge had not been submitted until no further delay was authorized, and that there was no record on file of his declination of promotion. Petitioner has raised no issue as to the Army's liberality in extending his Berry Plan deferment or the timing of his application. In his written statement for C.O. status, however, Nurnberg stated: "Recently, I have rejected on two occasions promotion in the military reserves." But, as we previously mentioned, the Board did not advert to his acceptance of promotion as any indication of his lack of sincerity. The issue is thus of minor, if any, significance. We find therefore no reasonable possibility that the petitioner was harmed by

his failure to receive Captain Locke's report.

## IV

Petitioner claims that there is a violation here of his constitutional right to equal protection of the laws because AR 135-25, which is applicable to Army Reservists, requires that the conscientious objector make his views known at the time of his induction or enlistment, while it is not necessary for the Selective Service conscientious objector to seek exemption at the time of his registration. The contention is frivolous. We cannot seriously entertain the argument that an 18 year-old who is required to register for the draft is to be equated with a volunteer who joins the Army Reserve Corps and is immediately commissioned as an officer in the Reserve. In any event, Nurnberg's loss of any rights he may have had as a Selective Service conscientious objector is directly attributable to his own decision voluntarily to enlist in the Reserve.

The further argument that the petitioner here is denied First Amendment rights because he is being required to serve in the military despite his religious beliefs is not persuasive. It has long been the rule that the "[d]ischarge [of a conscientious objector] from military service is available only because of a privilege granted by the executive branch of the federal government and not as a constitutional right. See In re Summers, 325 U.S. 561, 65 S.Ct. 1307, 89 L.Ed. 1795 (1945); United States v. MacIntosh, 283 U.S. 605, 51 S.Ct. 570, 75 L.Ed. 1302 (1931)." DeWalt v. Commanding Officer, 476 F.2d 440, 442 (5th Cir. 1973); see Brooks v. United States, 147 F.2d 134 (2d Cir.) cert. denied, 324 U.S. 878, 65 S.Ct. 1027, 89 L.Ed. 1430 (1945).

For the reasons given, the order appealed from is vacated and the petition for a writ of habeas corpus is dismissed.